## APPEAL OF PATTERSON-ANDRESS CO., INC.

Docket No. 5263.   Promulgated March 2, 1927.

*Personal service classification denied upon the ground that the evidence does not establish that the earnings are to be ascribed primarily to the activities of the principal stockholders.*

*Charles C. Parlin, Esq.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the Commissioner.

### FINDINGS OF FACT.

The taxpayer was incorporated September 17, 1917, under the laws of the State of New York, and has its principal office at 1 Madison Avenue, New York City. It was incorporated under the name of W. A. Patterson Co., Inc., which was changed on January 8, 1920, to Patterson-Andress Co., Inc.

During 1919 and 1920 the stockholders of record and the number of shares owned by each were:

|  | Shares. |
| --- | --- |
| W. A. Patterson | 462 |
| C. S. Andress | 462 |
| Miss A. J. Brown | 76 |

During these years Patterson was president, Andress was vice president and treasurer, and Miss Brown was secretary and assistant treasurer.

Each of these persons had had, prior to 1917, many years of experience in the advertising business, and for several years prior to 1917 had been connected with the New York office of the Curtis Publishing Co.; Patterson as manager of the New York office, Andress as local manager for the Saturday Evening Post, and Miss Brown as secretary and assistant to the manager. In this connection they came into contact with advertisers and advertising agencies, and, believing that the agencies then operating were turning out machine-made products and that there was an opportunity for a different kind of advertising agency, the taxpayer corporation was formed by them for that purpose.

The first account obtained was that of I. W. Lyons & Sons, who were dissatisfied with the service rendered by the agency theretofore handling their advertising. After handling this account for

three years, Andress was elected a member of the board of directors of that company.

In January, 1918, Andress received a letter from the Franklin Automobile Co., advising that they were about to sever their agency connections and suggesting a conference. Andress had advised with that company concerning its advertising while he was connected with the Curtis Publishing Co. From thirty agencies seeking the account, the taxpayer was chosen upon the assurance that personal attention would be given the advertising.

Taxpayer acted as advertising agent for the Curtis Publishing Co., handling the advertising which that company placed in other magazines, preparing the copy therefor and advising with its officials generally with reference to the advertising and circulation of their publication. This was handled by Patterson, who spent at least two days a week upon the problems of that company.

During the years involved, recognition as an agency was extended to taxpayer by the Curtis Publishing Co. under an instrument dated October 4, 1917, the material portions of which read as follows:

Date          October 4th, 1917.

### AGENCY TERMS

RESERVING TO The Curtis Publishing Company the right at any time, upon written notice, to annul or change the conditions of this agreement, we will hereafter, and until further notice, accept orders from you for advertising space in The Ladies' Home Journal, The Saturday Evening Post, The Country Gentleman, or any other periodicals controlled by The Curtis Publishing Company, on the following terms:

FIRST: Orders will be accepted only when made out at full gross rates without stipulation of agency commission or deduction.

SECOND: Subject to and upon the terms hereof, bills will be rendered to you monthly, subject to thirteen per cent. (13%) agency differential and three per cent. (3%) cash discount (figured on the net amount).

THIRD: This agency differential, in the case of each advertiser, is conditional upon our being satisfied that you have been and are rendering adequate service calculated to develop his business, and further upon our being satisfied that you are charging the advertiser gross rates on all our advertising. We will not be so satisfied, however, and will make no allowance if we conclude you are charging rates on any periodicals in such way as inures to our disadvantage in the matter of our own rates. You are not to make any charge to any person in such way as would in our judgment, directly or indirectly, injure our business or interests. The expression of our dissatisfaction in any particular shall be final. But we will gladly alter our decision in any particular case if you are able to make us an explanation which will satisfy us.

FOURTH: The cash discount of three per cent. (3%) will be figured on your net bill, and will be allowed only upon the condition that payment is made by you in full during the month in which the bill is rendered. You may allow a cash discount of three per cent. (3%) on our gross bill to you for space, to your clients, provided they pay (your bill) during the month in which we bill you, and only upon this condition.

Recognition by the Publishers Association of New York City was extended to the corporation by a letter dated November 26, 1917, reading:

I take pleasure in advising you that recognition of this Association has been extended to you for one year, subject to continuation should the volume of business placed during that time warrant such action.

Recognition is extended also subject to the stipulation that you will not request publication of free reading matter.

The American Newspaper Publishers Association on March 26, 1918, recognized the taxpayer as an authorized agent by a letter bearing that date and having the same wording as the letter from the Publishers Association quoted above.

In placing orders for advertising space, the following form was used:

THE PATTERSON-ANDRESS COMPANY, INC., ADVERTISING, ONE MADISON AVENUE, NEW YORK

Date_____

Publisher_____

_____

Insert advertising of_____
Space_____     Insertions_____
As follows:
Position_____

_____

Charge $_____ Gr. Less_____% Com. less_____% cash disc.

It is understood and agreed that the rate for this order is the minimum rate at which a contract for similar space and conditions can be secured, and that if at any time during the life of this contract you make a lower rate for same space and conditions, then this contract is to be completed at such lower rate from that date.

We reserve the privilege of using space for this advertiser for one year from starting date at rates named on rate card on which this order is based.

Unless otherwise agreed, this order may be cancelled, or less space used, by the payment of short rate in accordance with rate card on which the rates of this order are based.

Short rate bills must be rendered within 60 days after expiration of contract.

Any insertion not in accordance with instructions will not be paid for.

The advertising, when received in time for early editions, must appear in all editions on the date for which the advertising is ordered, or pro-rata refund will be demanded.

One copy of each issue in which the advertising appears must be sent to the advertiser, and one to this office.

ALL BILLS MUST BE RENDERED MONTHLY

THE PATTERRSON-ANDRESS COMPANY INC.
Per_____

This order was prepared in triplicate, one copy sent to the publisher, one to the advertiser, and the other retained by the taxpayer.

Taxpayer attended to the preparation of the copy to be used in the advertisement and secured cuts of any photographs of drawings to be used. After the advertisement had been approved by the advertiser, the taxpayer would forward the copy to the publisher for insertion.

The services rendered by the taxpayer to the advertiser include a study of the product and of the competition to be met, possible improvements, preparation of the advertising, including illustrations and texts, the selection of the publications or other mediums to be used, and the frequency with which they should be used.

Bills for advertising space, whether in newspapers, magazines, billboards, or otherwise, are generally sent by the publisher to the taxpayer. The space used by each advertiser is billed separately. Such space is billed at the regular rate charged by the publisher. The taxpayer, as a recognized advertising agency, is allowed a discount of from 10 to 15 per cent. This discount is known as a commission and is retained by the taxpayer as compensation for its services, which include the study of the product and the market therefor, preparation of the advertising matter, and the other services mentioned above, rendered in connection with the sale of the products of the client. A further discount is generally allowed for cash payment within a certain period.

In placing orders for advertising space the name of the advertiser is invariably given. The taxpayer has never ordered space for its own use. Generally, bills for advertising are sent by the publisher to the taxpayer, but in some instances advertising prepared by the taxpayer is placed by the advertiser directly or through representatives, in which case the publisher bills the advertiser for the space and the taxpayer bills the advertiser for its commission, which would be 15 per cent of the price paid for the space.

When advertising space is ordered for one client and is canceled, it may not be used by the advertising agent for another client. In such cases, if there is a difference in rate between the space contracted for and that used, the space used is billed by the publisher at the higher rate. The taxpayer has no control over space which it has ordered for a client. Where space has been ordered by the taxpayer for a client and the relationship is terminated the space can be used only by the client and not by the taxpayer, either for itself or for another client.

It is customary for the taxpayer to receive payment from advertisers before the date when payment becomes due to the publisher. In 1920 the taxpayer paid from $40,000 to $60,000 for advertising of a client, borrowing the money at the bank to enable it to do so and accepting notes from the client in part payment.

In the preparation of advertising matter, it was necessary to have photographs made and art work done and to have electrotypes, lithographs, and engraved plates prepared. The officers of the taxpayer supervised and directed this work. In the case of an illustration to be prepared by an artist the general layout of the work desired would be specified. All such work as photographs, artists' drawings, electrotypes, engravings, lithographs, etc., was ordered by the taxpayer on its own account. In some instances the work was billed to the client at cost to the taxpayer, and in other instances a service fee was charged.

During 1919 and 1920 the taxpayer had in its employ between ten and twenty persons who were not stockholders. These included an art director and two men who did lettering upon advertisements and otherwise assisted in the preparation of advertising matter.

The income and expenses for the years involved were as follows:

| | 1919. | 1920. |
|---|---|---|
| **Income.** | | |
| Advertising income | $100,694.46 | $149,360.42 |
| Preparation income | 5,100.37 | 4,488.83 |
| Bank interest | 590.13 | 995.07 |
| Other interest | 8.08 | 380.08 |
| Discounts | 17,516.68 | 5,408.01 |
| Art department | | 4,200.91 |
| Miscellaneous | | 92.45 |
| Total | 123,909.72 | 164,925.77 |
| **Expenses.** | | |
| Salaries | 39,501.24 | 60,213.59 |
| Rent | 4,133.32 | 13,025.01 |
| Stationery and office supplies | 1,044.65 | 1,291.79 |
| General expense | 2,118.57 | 2,461.38 |
| Traveling expense | 2,676.61 | 2,046.38 |
| Discount | 15,047.76 | |
| Miscellaneous | 677.19 | 1,939.80 |
| Interest | | 1,075.06 |
| Taxes | 380.31 | 1,086.71 |
| Depreciation | 311.04 | 918.57 |
| Total | 65,890.69 | 84,058.29 |

The advertising income was the discount allowed by publishers to taxpayer upon the charge made to advertisers for space. Preparation income was the difference between amounts billed to clients and amounts paid out for art work, photography, electrotypes, engraving, lithographing, printing and other such services. This work was all done by persons outside taxpayer's organization, on order from taxpayer. In some cases the clients were billed at cost; in other cases at cost plus a commission. The item of interest in 1920 was the amount received from certain accounts or bills receivable. The item of $17,516.68 from discounts in 1919 income represents the amounts allowed by publishers, printers, lithographers, and others as cash discounts for prompt payment of accounts. The item of $15,047.76 in 1919 expense represents such cash discount allowed by taxpayer to advertisers.

The salaries stated for each year are the amounts paid to employees other than the stockholders.

The assets and liabilities shown by the balance sheets of the company at the beginning and end of each of the taxable years were as follows:

| | January 1, 1919. | December 31, 1919. | December 31, 1920. |
|---|---|---|---|
| **Assets.** | | | |
| Cash | $8,112.31 | $34,268.35 | $32,286.96 |
| Accounts receivable | 24,568.47 | 41,544.83 | 77,460.30 |
| Due from officers | | | 7,136.08 |
| Deferred charges | | 16.66 | |
| Furniture and fixtures | 1,775.72 | 2,799.40 | 5,079.66 |
| Good will | | 80,000.00 | 80,000.00 |
| Deficit | 3,760.39 | | |
| | 38,216.89 | 158,629.24 | 201,963.00 |
| **Liabilities.** | | | |
| Accounts payable | 17,991.20 | 33,481.51 | 9,532.18 |
| Notes payable | | | 31,000.00 |
| Due officers | 54.17 | 4,759.09 | 4,044.70 |
| Capital stock | 20,171.52 | 100,000.00 | 100,000.00 |
| Surplus | | 20,388.64 | 57,386.12 |
| | 38,216.89 | 158,629.24 | 201,963.00 |

Accounts receivable represented unpaid amounts billed to clients for advertising, art work, etc. Accounts payable represented unpaid amounts billed by publishers, artists, photographers, printers, etc. Notes payable represented money borrowed in 1920 to finance the account of one client.

As of December 31, 1918, and December 31, 1919, the amount unpaid by clients after deducting taxpayer's commission thereon was approximately equal to the amount due to publishers. As of December 31, 1920, taxpayer had financed the advertising of its clients, or one of them, to the extent of approximately $55,000, by paying such amount for advertising of the client prior to payment therefor by the client.

### OPINION.

PHILLIPS: The sole question presented for determination is whether the taxpayer is entitled to exemption from the corporate income and profits tax as a personal service corporation. Section 200 of the Revenue Act of 1918 defines such a corporation to be one—

* * * whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include * * * any corporation 50 per centum or more of whose gross income consists * * * of gains, profits or income derived from trading as a principal * * *.

The principal function of the taxpayer was to render an advertising and sales service to its clients. As a part of this service it studied

the advertising needs of its clients, prepared the advertising matter, gave advice to its clients with respect to the magazines or newspapers to be used, and placed orders for advertising space. The record disclosed that in each order for space the name of the client was given and that the rate to be paid per line often depended upon the total amount of space used by the advertiser within any year. The space so reserved belonged to the advertiser and not to the agent. If the agency terminated, such space could not be used by the agent, but was available for use by the advertiser, whether or not he secured another agent. Whether or not the taxpayer pledged its credit for the payment of bills for advertising placed through it (upon which question we express no opinion), it seems clear that it did not purchase and sell advertising space on its own behalf, and that it does not fall within that portion of the definition which excludes corporations 50 per centum or more of whose gross income is derived from trading as a principal.

There is no question that the principal stockholders were regularly engaged in the active conduct of the business. We must consider, then, whether the income is to be ascribed primarily to their activities and whether capital, invested or borrowed, was a material income-producing factor.

An examination of the balance sheets will show that for 1919 capital, as compared with the business done, was very small. An examination of income and expense will show that the earnings of the taxpayer distributable to the stockholders were approximately $58,000 for 1919, of which some $3,000 is interest and discount attributable directly to the use of capital, and $81,000 for 1920, of which some $5,500 is interest and discount. During these same years the corporation paid to some fifteen, twenty or more employees, who were not stockholders, $39,500 and $60,000, respectively, amounts almost as great as those distributable to the stockholders. We know nothing of the services performed by these employees, except that one was art director and two others did lettering upon the advertisements. In our opinion it can not be said that in such circumstances the income is to be attributed primarily to the activities of the stockholders. They secured the clients—it was to their experience and guidance that clients looked, but the performance of the duties undertaken, from the time of the first step to the checking and preparation of a statement of the proper charges for advertising, required the services of an organization which outnumbered the stockholders by six or seven to one. We do not mean to hold that personal service classification must be denied in all cases where there are employees under the supervision of stockholders, but where, as here, employees so greatly outnumber the stockholders and there is no evidence of the character of the service

performed by most of them and they receive substantially one half of the earnings over the expenses other than salary, we can not find that the income is to be ascribed primarily to the activities of the stockholders. In our opinion this clause means more than that the stockholders shall obtain the clients and supervise the work, or that clients shall look to their experience; it means, among other things, that the corporation may not rely upon non-stockholders to do a substantial amount of the work which produces the income whether such work be detailed or supervisory. Just as another clause excludes from personal service classification those corporations where capital contributes materially to the income, so does this clause exclude corporations where the services of employees so contribute.

There is an additional factor to be considered in 1920. In that year taxpayer used its capital and its surplus and borrowed money to enable a client to continue its advertising campaign. How far this use of capital contributed to income we are unable to determine, but there is no doubt that the commissions received from this advertising were substantial. In consideration of all the circumstances, personal service classification must be denied.

*Decision will be entered for the Commissioner.*